John B. Sganga (SBN 116,211)
john.sganga@knobbe.com
Sean M. Murray (SBN 213,655)
sean.murray@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Loni Morrow (SBN 287,693)
Loni.morrow@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
12790 El Camino Real
San Diego, CA  92130
Telephone: (858) 707-4000
Facsimile: (858) 707-4001

Attorneys for Plaintiff
LUND MOTION PRODUCTS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LUND MOTION PRODUCTS, INC., a Delaware corporation, | Case No. 8:17-CV-01914 CJC (JPRx) |
| Plaintiff and Counterdefendant, | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' INEQUITABLE CONDUCT COUNTERCLAIM AND TO STRIKE RELATED AFFIRMATIVE DEFENSES** |
| v. | |
| T-MAX (HANGZHOU) TECHNOLOGY CO., LTD., a Chinese corporation, T-MAX (QINGDAO) INDUSTRIAL CO., LTD., a Chinese corporation, T-MAX INDUSTRIAL (H.K.) CO. LTD, a Hong Kong corporation, and T-MAX (QINGDAO) INTERNATIONAL TRADING CO., LTD., a Chinese corporation, | **Hearing Date: April 2, 2018 Time: 1:30 p.m. Courtroom: 9B** |
| Defendants and Counterclaimants. | |
| AND RELATED COUNTERCLAIMS | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................... 3

    A.    The Parties .................................................................................. 3

    B.    The PCT Documents Allegedly Withheld: the
        International Search Report and the Non-Existent
        Written Opinion .......................................................................... 4

    C.    The Chinese Patent ..................................................................... 8

III.  GOVERNING LAW ........................................................................... 9

IV.   T-MAX FAILED TO PLEAD ITS INEQUITABLE-
      CONDUCT COUNTERCLAIM WITH PARTICULARITY ................. 11

    A.    T-Max Alleged No Facts Plausibly Suggesting That A
        Written Opinion Exists .............................................................. 11

    B.    T-Max's Allegations Regarding The International Search
        Report Are Deficient ................................................................. 12

        1.    T-Max's Allegations Fail To Satisfy Multiple
              Requirements Of *Exergen* ............................................... 12

        2.    Amendment Would Be Futile Because The
              International Search Report Was Immaterial As A
              Matter Of Law ................................................................... 15

    C.    T-Max's Allegations Regarding The Chinese Patent Are
        Deficient ................................................................................... 16

        1.    T-Max's Allegations Fail To Satisfy *Exergen's*
              Pleading Requirements ...................................................... 16

        2.    Amendment Would Be Futile Because No Facts At
              All Support T-Max's Improbable Theory ........................... 18

V.    T-MAX'S AFFIRMATIVE DEFENSES BASED ON
      INEQUITABLE CONDUCT SHOULD BE STRICKEN ..................... 20

VI.   CONCLUSION ................................................................................ 21

# TABLE OF AUTHORITIES

**Page No(s).**

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ........................................ 9

*ATD Corp. v. Lydall, Inc.,*
  159 F.3d 534 (Fed. Cir. 1998) ........................................ 15

*Balistreri v. Pacifica Police Dep't*
  901 F.2d 696 (9th Cir. 1990) ........................................ 10

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ........................................ 9

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
  575 F.3d 1312 (Fed. Cir. 2009) ........................................ *passim*

*International Business Machines Corp. v. Priceline Group, Inc.,*
  No. 15-137, 2017 WL 1349175 (D. Del. April 10, 2017) ........................................ 10, 20

*Lakim Indus., Inc. v. Linzer Prod. Corp.,*
  No. 2:12-cv-04976, 2012 WL 12547988
  (C.D. Cal. Nov. 7, 2012) ........................................ 9, 10, 15

*Rosen v. Masterpiece Marketing Group, LLC,*
  No. 15-cv-06629, 2016 WL 7444698 (C.D. Cal. May 3, 2016) ........................................ 20

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,*
  806 F.2d 1393 (9th Cir. 1986) ........................................ 15

*Therasense, Inc. v. Becton, Dickinson & Co.,*
  649 F.3d 1276 (Fed. Cir. 2011) (*en banc*) ........................................ *passim*

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9 ........................................ *passim*

Federal Rule of Civil Procedure 12 ........................................ 10

# I.  <u>INTRODUCTION</u>

This is a patent-infringement case in which Plaintiff Lund Motion Products, Inc. has asserted three patents that relate to automatically retracting running boards for motor vehicles: U.S. Patent No. 8,157,277, No. 9,302,626 and No. 9,561,751 (the "Asserted Patents").   The two defendants who responded to Lund's complaint – T-Max (Hangzhou) Technology Co., Ltd. and T-Max Industrial (H.K.) Co. Ltd (collectively, "T-Max") – asserted an inequitable-conduct counterclaim based on the alleged withholding of three documents from the Unites States Patent and Trademark Office ("PTO").  Lund now moves to dismiss that counterclaim for failure to plead it with particularity.

T-Max's inequitable-conduct counterclaim centers on three documents that allegedly arose during prosecution of Lund's foreign counterpart patents: (1) a written opinion on patentability; (2) a search report; and (3) a Chinese-language patent.  T-Max has the heavy burden of proving (1) but-for materiality, *i.e.*, that a patent claim never would have issued had these documents been submitted to the PTO; and (2) that the "single most reasonable inference" from the facts is that the documents were withheld with the specific intent to deceive the PTO.   Under Rule 9(b), T-Max must plead inequitable conduct with particularity.

T-Max failed to do so.   Regarding the alleged written opinion on patentability, no written opinion appears ***anywhere*** in the online records for the international patent application, and T-Max alleged no facts indicating that the international search authority ever prepared a written opinion.   Thus T-Max accuses Lund of withholding a document that never existed.  With regard to the international search report, Lund's predecessor indisputably gave the PTO ***each and every*** prior art reference cited in the report.   Under Federal Circuit law, international search reports are immaterial when the prior art references cited in the report are separately submitted.  Finally, in the case of the Chinese patent, T-

1 Max does not and cannot allege that someone associated with the U.S.
2 prosecution of the Asserted Patents ever received a copy of the Chinese patent,
3 let alone an English translation that would have revealed the patent's content.
4 Lund is not aware of such facts, and T-Max cannot possibly have any more
5 information about the confidential and privileged communications between the
6 applicants' Chinese counsel and their U.S. counsel.  Thus, T-Max's allegation
7 of inequitable conduct is based on mere speculation that something untoward
8 may have occurred.  Such speculation is not a proper basis for making the very
9 serious charge of inequitable conduct.

10      The few facts T-Max did plead are insufficient to satisfy Rule 9(b).  In
11 alleging materiality, T-Max did little more than assert that the allegedly
12 withheld documents were material because they appeared in the prosecution of
13 related foreign patent applications.  But T-Max failed to identify any specific
14 patent claim – pending at ***any point*** in the decade-long proceedings before the
15 PTO – to which the search report and Chinese patent are material.  Nor did
16 T-Max address whether the allegedly withheld documents were cumulative of
17 information already before the PTO.  And T-Max never addressed how or why
18 such a claim would have been deemed unpatentable had the PTO received the
19 search report or the Chinese patent.  Without such specific allegations, a court
20 cannot plausibly infer that an allegedly withheld document contained
21 information that was "but-for" material to a pending claim, such that the claim
22 never would have issued had the document been before the PTO.

23      With respect to deceptive intent, T-Max never alleged ***who*** precisely
24 committed inequitable conduct.  Nor does T-Max allege specific facts indicating
25 that this unidentified person knew of the references' allegedly material content
26 and withheld those documents with the specific intent to deceive the PTO.

27      Finally, T-Max should not be accorded leave to amend its deficient
28 pleading, as any amendment would be futile.  The alleged written opinion never

-2-

existed, so T-Max could plead no facts supporting materiality or intent. The search report is immaterial as a matter of law. And T-Max has no way to identify confidential communications from the applicants' Chinese counsel transmitting a copy of the Chinese patent, even if some were to exist. Thus T-Max could not possibly add new facts to its pleading that would support an inference that someone in the U.S. had an English translation of the Chinese patent and acted with an intent to deceive.

After Lund informed T-Max that its inequitable-conduct counterclaim and many of its affirmative defenses were insufficiently pled, T-Max filed an amended answer withdrawing or amending seventeen of its twenty-three affirmative defenses. But T-Max declined that opportunity to amend its inequitable-conduct counterclaim, undoubtedly because it had no additional facts that could buttress its unsubstantiated charge of inequitable conduct. This confirms that any further amendment would be futile. T-Max's inequitable-conduct counterclaim should therefore be dismissed without leave to amend, and its affirmative defenses based on inequitable conduct should be stricken.

## II.  FACTUAL BACKGROUND

### A.    The Parties

Lund is one of the world's leading automotive accessory providers, offering functional, high-performance, protective and stylish products for the industry's most recognized brands. Dkt. 1 (complaint) at 5. The products at issue in this case are retractable running boards, also known as electric steps, which attach to the side of a vehicle and are capable of extending outward for use as a step and retracting inward at least partially under the vehicle. *Id.* Lund is the successor of AMP Research, the original manufacturer of the PowerStep™ and PowerStep XL™ lines of retractable vehicle steps. *Id.* Lund now manufactures all of the PowerStep™ products in America and has an extensive patent portfolio protecting its innovations. *Id.*

-3-

T-Max is a Chinese manufacturer of automotive parts and accessories. *Id.* at 6. A T-Max affiliate – T-Max, LLC – previously infringed an electric-step patent in the same patent family as the patents-in-suit and was enjoined by this Court. *See 89908 Inc. v. T-Max, LLC*, No. 8:08-cv-00323-CJC-RNB (C.D. Cal.). Dkt. 1-11. Lund filed this suit against T-Max on October 31, 2017, after discovering that T-Max had infringed Lund's electric-step patents and copied copyrighted works of art from Lund's electric-step installation guide. Dkt. 1.

In response to Lund's suit, T-Max asserted twenty-three affirmative defenses and seven counterclaims, including a counterclaim for inequitable conduct. Dkt. 18. After the parties met and conferred on the present motion, T-Max filed an amended answer in which it withdrew eleven affirmative defenses and amended six others.[1] However, T-Max made no amendment to its allegations of inequitable conduct. *Id.* T-Max did amend its affirmative defense of unclean hands to specify that the defense is based on the same allegations of inequitable conduct. Dkt. 25 at 13, ¶ 123. The present motion challenges the sufficiency of T-Max's pleading of its Seventh Counterclaim (unenforceability), Second Affirmative Defense (unenforceability), and Eighth Affirmative Defense (unclean hands).

## B. The PCT Documents Allegedly Withheld: the International Search Report and the Non-Existent Written Opinion

In asserting inequitable conduct, T-Max argues that the applicants for the Asserted Patents should have submitted to the PTO two documents that allegedly arose in the Patent Cooperation Treaty (PCT) application that AMP Research filed with the World Intellectual Property Organization (WIPO) on October 16, 2002. One is the "international search report," the other is an

---

[1] T-Max withdrew original affirmative defense nos. 1, 5, 6, 8, 9, 11, 14, 17, 18, 19 and 23. It amended original affirmative defense nos. 4, 10, 12, 15, 16 and 20. *Compare* Dkt. 18 *with* Dkt. 25.

alleged "written opinion" that T-Max neither appends to the complaint, nor makes accessible via a hyperlink.  Dkt. 25 at 18-19, ¶¶ 25-27.

The Patent Cooperation Treaty is an international treaty that allows an applicant to seek patent protection in multiple countries by filing a single application with WIPO in Geneva, Switzerland.  Ex. 1 at § 2.001.  After a PCT application is filed, WIPO forwards the application to patent offices in the countries designated by the applicant.  *Id.* at § 3.002.  The applicant also selects a specific patent office, such as the PTO or the European Patent Office, as the international search authority for the PCT application.  *Id.*  The search authority performs a search for prior art references and issues an international search report listing the documents and placing them in categories based on their potential relevance to the PCT claims.  *Id.*  The search authority may also issue a written opinion on patentability.  *Id.* at § 3.003.  The search authority sends the international search report and any written opinion to WIPO for inclusion in WIPO's official records.  *Id.* at § 7.028.  WIPO then publishes the patent application, international search report and any written opinion approximately eighteen months after the filing of the PCT application.  *Id.* at §§ 7.028, 9.001(iii).  The individual countries designated by the applicant may rely on the international search report and any associated written opinion, or they may conduct their own supplemental prior art search.  *Id.* at § 3.003.  Patent prosecution proceeds separately in the designated countries, and each country independently decides whether to grant the applicant a patent.  *Id.* at § 3.004.

As reflected in WIPO's online listing of documents associated with this application, WIPO published AMP Research's application and an international search report on May 15, 2003, under publication number WO 03/039910A1.  Ex. 2 (Initial Publication with ISR); Ex. 3 (WIPO document list).  The Initial Publication with ISR has three components: (1) a two-page cover sheet, (2) the patent application, and (3) the three-page international search report.  Ex. 2.

A corrected version of the Initial Publication with ISR issued on February 19, 2004, and is described on the WIPO documents list as a "Corrected version of pamphlet."  Ex. 4 (corrected publication); Ex. 3.  Like the initial publication, the corrected publication contains a cover sheet, the (corrected) patent application, and a copy of the previously published search report.  Ex. 4.  T-Max has alleged that the search authority issued a written opinion on patentability.  Dkt. 25 at 8-9, ¶¶ 107-109 and 18-19, ¶¶ 25-27.  But no separate written opinion was included in either WIPO publication or in any other document on WIPO's document list.  Exs. 2-4; Morrow Decl. ¶ 3.  Nor does the international search report contain a written opinion.  Ex. 2 at 120-122.  To Lund's knowledge, no such written opinion exists.

The international search report lists nine documents: seven Category A references relating to the "general state of the art," and two Category X references "of particular relevance" to the issue of novelty.  *Id.* at 120 (description of categories).  The search reports lists specific claims to which the two "Category X" documents were deemed relevant.  One of those documents is a published patent application by one of the inventors of the Asserted Patents, Horst Leitner, which subsequently issued as U.S. Pat. No. 6,641,158.  Morrow Decl. ¶ 5; Ex. 5.  For the Leitner reference, the search report indicates that the document is relevant to all 58 claims in the PCT application.  Ex. 2 at 120.  The other "Category X" document is a patent issued to an inventor named Stairs.  For the Stairs patent, the search report lists a subset of claims to which the reference was deemed relevant.  *Id.*  For the seven background documents in "Category A," the search report lists no claims.  *Id.* at 120-121.  Reproduced below is an excerpt from the first page of the search report, which shows the two "Category X" documents and three of the seven "Category A" documents.

| C. DOCUMENTS CONSIDERED TO BE RELEVANT | | |
|---|---|---|
| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| P,X | US 2002/113400 A1 (LETNER04)<br>22 August 2002 (2002-08-22)<br>the whole document<br>--- | 1-58 |
| X | US 3 172 499 A (STAIRS)<br>9 March 1965 (1965-03-09) | 1,3,4 |
| A | the whole document<br><br><br>--- | 5,7,20,<br>33,44,<br>56-58 |
| P,A | US 6 375 207 B1 (DEAN)<br>23 April 2002 (2002-04-23)<br>--- | |
| A | US 5 957 237 A (TIGNER)<br>28 September 1999 (1999-09-28)<br>--- | |
| A | US 4 623 160 A (TRUDELL)<br>18 November 1986 (1986-11-18)<br>--- | |
| | -/-- | |

*Id.* at 120.  Thus, for the seven background documents listed in the search report, the report provides no information at all beyond the identity of the document.

AMP Research submitted all nine of the documents listed in the search report to the PTO.  This is clear from the face pages of the Asserted Patents, which list all nine documents.  Exhibits 6-8 are copies of the Asserted Patents with the nine references highlighted in yellow.[2]  Thus, the PTO had all the prior art the international search authority deemed pertinent.  T-Max did not plead otherwise.

Pursuant to PCT procedure, WIPO forwarded AMP Research's PCT application to Canada and China for separate prosecution in each country.  Ex. 1 at § 3.002.  Thus, the national patent offices in these two countries each received

---

[2] U.S. Patent No. 9,561,751 (Ex. 8) and No. 9,302,626 (Ex. 7) list the issued Leitner patent, U.S. Patent No. 6,641,158, which was published as 2002/0113400 before the patent issued.  Ex. 5, Morrow Decl. ¶ 5.  U.S. Patent No. 8,157,277 (Ex. 6) lists the Leitner publication itself.

-7-

the WIPO publication including the international search report.  See, e.g., Ex. 9 (reflecting national entry into Canada and China of the WIPO publication attached as Ex. 2).  Despite receiving the international search report that T-Max characterizes as "but-for material," Canada and China both granted a patent to AMP Research.  Ex. 10 (Chinese patent); Ex. 11 (Canadian patent).

## C.  The Chinese Patent

The third reference on which T-Max relied to allege inequitable conduct is Chinese Patent No. 2174368Y.  Ex. 12.  T-Max alleged that this Chinese-language patent was "identified" by a Chinese patent office examiner during the national phase of the PCT process.  Dkt. 25 at 9-10, ¶ 111 and 19-20, ¶ 29.  But T-Max did not allege that the Chinese patent was the basis of a rejection.  Dkt. 25.  T-Max did not allege that the Chinese examiner described the patent as material to patentability.  *Id.*  And T-Max did not allege that Chinese counsel sent a copy of the patent to U.S. counsel, or that any particular person in the U.S. associated with AMP Research or the prosecution of the Asserted Patents ever possessed a copy of the document.  *Id.*

As T-Max acknowledges, the Chinese patent office had the prior art Chinese patent during the national-phase prosecution in China.  After presumably reviewing that patent, the Chinese patent office nevertheless granted AMP Research its own patent.  Ex. 10.  Exhibit 10 is a copy of AMP Research's issued Chinese patent with the number of the prior art Chinese patent – No. 2174368Y – highlighted in yellow in the cited references section of the cover page.  Morrow Decl. ¶ 10.  T-Max does not plead that the Chinese patent office relied on or ever articulated the specific relevance of the Chinese prior art patent.  And ultimately, the Chinese patent office concluded that Amp Research was entitled to its own Chinese patent.  Ex. 10.

# III.  GOVERNING LAW

The Supreme Court tightened pleading standards in *Bell Atl. Corp. v. Twombly* and *Ashcroft v. Iqbal,* holding that pleadings must include enough facts to state a claim for relief that is "plausible on its face."  *See Twombly*, 550 U.S. 544, 547 (2007); *Iqbal*, 556 U.S. 662, 678 (2009).  Properly pled claims must contain enough facts to cross the line from merely conceivable to actually plausible. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678-79.

One seeking to prove inequitable conduct based on the non-submission of a reference must prove that the reference was material and that it was withheld with the specific intent to deceive the PTO.  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).  Rule 9(b) of the Federal Rules of Civil Procedure requires that a pleading of inequitable conduct allege with particularity the circumstances constituting inequitable conduct.  *Id.* at 1326. *Exergen* set forth specific requirements for pleading inequitable conduct with particularity.  In so doing, the court noted that a pleading of inequitable conduct "requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  *Id.* at 1327.

In *Therasense*, the Federal Circuit raised the requirements for proving inequitable conduct.  *See Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1290 (Fed. Cir. 2011) (*en banc*). ("This court now tightens the standard for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.").  The court sought to limit the inequitable conduct defense to egregious misconduct and to exclude "the mere nondisclosure of prior art references to the PTO."  *Id.* at 1292-96; *see also, e.g.*, *Lakim Indus., Inc. v. Linzer Prod. Corp.*, No. 2:12-cv-04976, 2012 WL 12547988, at *6 (C.D. Cal. Nov. 7, 2012) ("*Therasense* clarified and dramatically tightened standard for proving—and by extension, pleading— claims of inequitable conduct.  In doing so, *Therasense* stressed that inequitable

-9-

conduct is purely a judicial gloss on statutory patent law, developed specifically to deal with patent cases involving particularly egregious misconduct….").

After *Therasense*, inequitable conduct now requires proof that the allegedly withheld reference was but-for material, *i.e.*, that the PTO would not have issued the patent had the reference been submitted, and that "the single most reasonable inference" from the facts is that the reference was withheld with the specific intent to deceive the PTO. *See Therasense,* 649 F.3d at 1290. However, *Therasense* did not purport to alter the high level of particularity required by *Exergen* for pleading inequitable conduct.

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a counterclaim that lacks "sufficient facts alleged under a cognizable legal theory." *Lakim*, 2012 WL 12547988, at *1 (*citing Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). Counterclaims of inequitable conduct that are not pled with sufficient particularity should be dismissed under Rule 12(b)(6). *See Lakim*, 2012 WL 12547988, at *2; *Exergen*, 575 F.3d at 1326. And when a counterclaim of inequitable conduct is dismissed, any corresponding affirmative defense of inequitable conduct should be stricken. *See International Business Machines Corp. v. Priceline Group, Inc.*, No. 15-137, 2017 WL 1349175 at *4 and *21 (D. Del. April 10, 2017) ("Defendants' counterclaim and affirmative defense for inequitable conduct rise and fall together.").

-10-

## IV.  T-MAX FAILED TO PLEAD ITS INEQUITABLE-CONDUCT COUNTERCLAIM WITH PARTICULARITY

T-Max's inequitable-conduct allegations with respect to all three non-submitted documents – the international search report, the alleged written opinion and the Chinese patent – fail to satisfy governing pleading standards.

### A.  T-Max Alleged No Facts Plausibly Suggesting That A Written Opinion Exists

WIPO's website lists the documents associated with International Application No. PCT/US02/33586.  Ex. 3 (printout of relevant page from https://patentscope.wipo.int).  No written opinion is listed among the documents associated with International Application No. PCT/US02/33586.  Morrow Decl. ¶ 3.  By contrast, the international search report (ISR) is listed as part of the "Initial Publication with ISR."  Ex. 3; Ex. 2 at 120-122.

T-Max's pleading did not attach any written opinion or cite to a WIPO document or webpage that refers to a written opinion.  Nor did T-Max quote from any written opinion, or plead any fact that suggests a written opinion was prepared in connection with AMP Research's PCT application.  Rather, T-Max merely alleged that, "[o]n information and belief, International Application No. PCT/US02/33586 resulted in an international search report and written opinion from the International Search Authority…."  Dkt. 25 at 18, ¶ 25.  But as the official WIPO website demonstrates, there is no written opinion distinct from the search report itself.  T-Max's allegation "on information and belief" that the international search authority issued a separate written opinion is not plausible in view of the publicly available WIPO records.

"Pleading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based."  *Exergen*, 575 F.3d at 1330.  Here the WIPO records of International Application

-11-

No. PCT/US02/33586 are not uniquely within Lund's control, but are publicly available online, and T-Max has not alleged specific facts that render its belief reasonable. Thus, T-Max's allegations relating to a separate written opinion fail to satisfy Rule 9(b) and should be dismissed.

### B.   T-Max's Allegations Regarding The International Search Report Are Deficient

#### 1.   T-Max's Allegations Fail To Satisfy Multiple Requirements Of *Exergen*

T-Max's allegations regarding the search report are equally deficient. They fail to satisfy any part of *Exergen's* requirement that a pleading of inequitable conduct identify "the specific who, what, when, where and how of the material misrepresentation or omission." *Id.* at 1327.

First, a pleading of inequitable conduct must "name the specific individual associated with the filing or prosecution of the application issuing as [the asserted patent], who both knew of the material information and deliberately withheld or misrepresented it." *Id.* at 1329. This is the "who" of the alleged inequitable conduct. *Id.* But T-Max never identified any specific individual who allegedly committed inequitable conduct. Rather, T-Max simply listed every potential category of person who could possibly have committed inequitable conduct with respect to a patent:

> 27. *On information and belief*, the international search report and the written opinion from the International Search Authority related to International Application No. PCT/US02/33586 were knowingly and intentionally withheld from the USPTO *by the applicant, AMP Research, the named inventors, and/or the prosecuting attorneys* in a deliberate effort to conceal material information which would have led to the USPTO rejecting one or more claims of the Patents-in-Suit.

Dkt. 25 at 19, ¶ 27 (emphasis added).  T-Max therefore failed to identify the "who" of the alleged material omission.  *See Exergen*, 575 F.3d at 1329.

Second, T-Max was required to identify the claims in the file histories of the Asserted Patents, and the limitations in those claims, to which the search report is relevant, and where in the search report material information may be found.  *See id.*  T-Max never explained how anything in the search report would have caused the PTO to reject a pending claim.  This is the "what" and "where" required by *Exergen*.  *Id.*  Yet T-Max's counterclaim never mentions a single patent claim that was pending in the U.S., let alone a specific limitation of such a claim.  Nor did T-Max identify where in the search report information material to a claim in the U.S. prosecution may be found.  T-Max stated generally that the "international search report identifies which specific claims of the PCT application are rendered unpatentable due to lack of novelty and/or inventive step based on specific prior art references identified from the search."  Dkt. 25 at 18-19, ¶ 26.  But while the search report is one examiner's opinion about the relevance of prior art to ***claims in the international PCT application***, *Exergen* required T-Max to identify where in the search report there is information relevant to ***a claim pending in the prosecution of the Asserted Patents***.  *Id.* T-Max made no such identification.

Third, T-Max never alleged facts indicating that the search report contained information the PTO did not already have.  T-Max was obligated to identify the specific claim limitations, or combination of limitations, that were allegedly absent from the information before the PTO during prosecution of the Asserted Patents.  *See Exergen*, 575 F.3d at 1330.  "Such allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims."  *Id.* at 1329-30.  T-Max's pleading, however, contains no discussion whatsoever of the references that were before

1    the PTO during the prosecution of the Asserted Patents, and certainly no
2    discussion of specific limitations or combinations of limitations that were
3    missing from those references. *See* Dkt. 25 at 17-21, ¶¶ 20-32. T-Max provided
4    no specifics at all to explain why the search report would have caused the U.S.
5    patent examiner to refuse to issue a patent to AMP Research.

6        The pleading deficiencies represented by T-Max's failure to plead the
7    "specific who, what, when, where and how" of the alleged inequitable
8    misconduct, even without consideration of further deficiencies, "are fatal under
9    Rule 9(b)." *See Exergen,* 575 F.3d at 1330.

10       However, T-Max's allegations of deceptive intent are deficient in another
11   critical respect. *Exergen* requires that a pleading of inequitable conduct contain
12   factual allegations showing that someone with knowledge of the search report
13   "knew of the specific information that is alleged to be material to the [Asserted
14   Patents] and then decided to deliberately withhold it from the relevant
15   examiner." *Id.* at 1331. But T-Max's formulaic pleading is, in this respect as
16   well, a factual desert. T-Max merely stated, once again "[o]n information and
17   belief," that the search report was "knowingly and intentionally withheld from
18   the USPTO by the applicant, AMP Research, the named inventors, and/or the
19   prosecuting attorneys in a deliberate effort to conceal material information
20   which would have led to the USPTO rejecting one or more claims of the
21   Patents-in-Suit." Dkt. 25 at 19, ¶ 27. Thus, T-Max identified no fact
22   inconsistent with the applicants' attorneys deciding in good faith not to submit
23   the search report because they deemed it cumulative or otherwise immaterial.

24       In sum, T-Max's allegations of inequitable conduct relating to the
25   international search report are completely lacking in facts which, if true, would
26   indicate that someone committed inequitable conduct in connection with the
27   prosecution of the Asserted Patents. Accordingly, these allegations fail to
28   comply with Rule 9(b) and should be dismissed.

-14-

2.      **Amendment Would Be Futile Because The International Search Report Was Immaterial As A Matter Of Law**

The Court should not permit T-Max to amend the allegations in its inequitable-conduct counterclaim pertaining to the search report because any amendment would be futile.   The Federal Circuit has ruled that international search reports – and the details of foreign prosecution in general – are immaterial if the prior art references cited in the international search report were separately submitted to the PTO:

> Although international search reports may contain information material to patentability if they contain closer prior art than that which was before the United States examiner, it is the reference itself, not the information generated in prosecuting foreign counterparts, that is material to prosecution in the United States. The details of foreign prosecution are not an additional category of material information.

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998).   In the present case, all nine references listed in the international search report were submitted to the PTO and are listed on the face of each Asserted Patent.   *Compare* Exs. 6-8 (copies of the Asserted Patents with the nine references highlighted) *with* Ex. 2 at 120-122 (international search report); Morrow Decl. ¶¶ 6-8.   The search report on which T-Max relies is therefore immaterial as a matter of law.

Because no amendment could change the inescapable fact that the search report is immaterial as a matter of law, T-Max should not be granted leave to amend its inequitable-conduct allegations relating to that report.   *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (denying leave where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency"); *Lakim*, 2012 WL 12547988, at *5 (denying leave where "Federal Circuit law clearly establishes that Linzer's inequitable conduct contentions fail as a matter of law").

-15-

### C.     T-Max's Allegations Regarding The Chinese Patent Are Deficient

T-Max pleads that a Chinese-language prior art patent identified by the Chinese patent office may have been material, and that it may have been intentionally withheld by someone associated with the Asserted Patents.   But T-Max's allegations regarding the Chinese patent are pure speculation.   They should be dismissed.

#### 1.     T-Max's Allegations Fail To Satisfy *Exergen's* Pleading Requirements

T-Max's allegations regarding the Chinese patent omit several categories of allegation required by *Exergen*.   First, T-Max's pleading does not identify the specific person who allegedly defrauded the PTO.   *See Exergen*, 575 F.3d at 1329.   T-Max merely stated that some unidentified person associated with AMP Research committed the alleged misconduct:

> **On information and belief**, Chinese Patent No. 2174368Y was knowingly and intentionally withheld from the USPTO **by the applicant, AMP Research, the named inventors, and/or the prosecuting attorneys** in a deliberate effort to conceal material information which would have led to the USPTO rejecting one or more claims of the Patents-in-Suit.

Dkt. 25 at 20, ¶ 31 (emphasis added).

Further, T-Max never identified the claims in the file histories of the Asserted Patents, and the specific limitations in those claims, to which the Chinese patent is relevant.   *See Exergen*, 575 F.3d at 1329.   Indeed, T-Max never mentioned a specific claim from the U.S. prosecution.

T-Max also failed to identify any portion of the Chinese patent that discloses material information.   *See id.*   Rather, T-Max attempted to establish that the Chinese patent was material "to patentability of the Patents-in-Suit

because, among other reasons, it was found by the Chinese Examiner to be material to patentability of Chinese Application No. CN02825000, which claims priority to the same two U.S. provisional applications as the Patents-in-Suit." Dkt. 25 at 20, ¶ 30. But T-Max never described the claims that were pending when the Chinese patent office identified the Chinese patent, nor alleged facts indicating that the claims pending in China contained the same limitations as claims pending in the U.S. prosecution. Only allegations showing the similarity of the claims pending in China and the U.S. would permit the inference that a reference relevant in China was also relevant in the U.S. Further, T-Max never alleged that the Chinese patent was but-for material in China, as opposed to mere background art. This is hardly surprising. The Chinese patent office granted the applicants a Chinese patent *despite* having identified and considered the prior-art Chinese reference. Ex. 10 (issued Chinese patent with Chinese reference highlighted); Morrow Decl. ¶ 10.

Further, T-Max failed to discuss the references that were before the PTO or identify specific claim limitations or combination of limitations that were supposedly absent from those references, but present in the Chinese patent. *See Exergen*, 575 F.3d at 1330. Thus no factual allegation in T-Max's pleading excludes the possibility that the material disclosed in the prior-art Chinese patent was cumulative of other references that were much closer to the claims pending in the United States.

Finally, T-Max articulated no specific facts which suggest that anyone acted with the intent to deceive the PTO. *See id.* at 1331. After *Therasense*, one alleging inequitable conduct must prove that "the single most reasonable inference" from the facts is that someone acted with the specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1290. "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* Yet T-

Max's counterclaim does not even allege this much.  T-Max did not identify anyone in the U.S. who had a translation of the Chinese patent or even a copy of the original Chinese-language document.  T-Max did not allege that the Chinese patent office relied on the Chinese patent to reject pending claims, or that anyone in the U.S. was familiar with such a rejection.  And T-Max did not allege facts supporting the notion that a specific person reviewed such a rejection, appreciated that the Chinese patent was material to claims pending in the U.S. because it disclosed information not before the PTO, and nevertheless deliberately withheld the Chinese patent with the intent to deceive the PTO. T-Max has therefore failed to allege facts that would allow the Court to conclude that the "single most reasonable inference" is that someone acted with the specific intent to deceive the PTO. *See id.*  T-Max's allegations fall far short of the level of specificity mandated by Rule 9(b) and *Exergen.*

## 2. <u>Amendment Would Be Futile Because No Facts At All Support T-Max's Improbable Theory</u>

The Court should not grant T-Max leave to rewrite its fatally flawed allegations concerning the Chinese patent.  Any amendment would be futile because T-Max cannot possibly allege facts suggesting that AMP Research's Chinese counsel ever sent the Chinese patent to AMP Research's U.S. counsel. T-Max can have no information concerning the confidential and privileged communications between AMP Research and its Chinese patent counsel. Significantly, T-Max alleged no facts suggesting that the Chinese patent was ever in the hands of *anyone* in the U.S.  T-Max merely alleged "[o]n information and belief" that the "identification" of the Chinese patent by the Chinese examiner "was made known to" AMP Research and the inventors.  Dkt. 25 at 19-20, ¶ 29.  T-Max's carefully worded allegation suggests only that someone in the U.S. may have had a list of patents "identified" by the Chinese examiner.  Even if T-Max could plead facts supporting its speculation that

1   someone in the U.S. possessed such a list, having a list is a far cry from having

2   an English translation of the Chinese patent itself, or knowing of its alleged

3   materiality.

4          T-Max's inequitable-conduct counterclaim does not even allege facts

5   suggesting that the Chinese patent was particularly important in the Chinese

6   prosecution and, as a consequence, may have been treated differently than the

7   typical foreign-language reference cited in foreign prosecution.  T-Max never

8   alleged that the Chinese patent was described by the Chinese examiner as

9   showing AMP Research's invention, never alleged that it was the basis for

10  rejecting claims, and never alleged that its limitations were substantively

11  discussed in any way during the Chinese prosecution.   Therefore nothing

12  indicates that the Chinese patent was important enough to be treated differently

13  from other foreign-language references and sent to U.S. counsel.   On the

14  contrary, the Chinese patent office ultimately allowed AMP Research a patent

15  over the Chinese reference.  T-Max's improbable theory – that the Chinese

16  patent somehow was sent to the U.S., translated, read, and then withheld –

17  should never have been alleged given that *no facts whatsoever* suggest this

18  unlikely sequence of events occurred.  It is pure speculation, and nothing more.

19         T-Max should not be allowed to amend its fraud allegations just to

20  embellish with additional words a theory that is wholly unsupported by fact.

21  That would be akin to permitting one who built a house on shifting sands,

22  thereby violating safety standards, to demolish the house and replace it with an

23  office tower.  If T-Max has any facts specific to this case suggesting that its

24  speculative theory actually occurred, facts which are glaringly absent from both

25  its original pleading and its amended pleading, it should identify those facts in

26  its opposition brief.  But T-Max will be unable to do so.

27         The Federal Circuit observed in *Therasense* that the "habit of charging

28  inequitable conduct in almost every patent case has become an absolute plague,"

and that even "reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds." *Therasense*, 649 F.3d at 1289.  The court could have been describing this case.

In sum, no amendment could add specific facts supporting T-Max's improbable theory that AMP Research's Chinese counsel sent anyone in the United States a Chinese-language patent that was merely "identified" in a Chinese prosecution.  T-Max's inequitable-conduct allegations relating to the Chinese patent should be dismissed without leave to amend.

## V.   **T-MAX'S AFFIRMATIVE DEFENSES BASED ON INEQUITABLE CONDUCT SHOULD BE STRICKEN**

Although T-Max has withdrawn many of the affirmative defenses in its original answer, its amended answer still asserts affirmative defenses of patent unenforceability (No. 2) and unclean hands (No. 8).  Dkt. 25 at 7-10, ¶¶ 103-114 and 13, ¶ 123.   The unenforceability defense recites the same inequitable-conduct allegations recited in T-Max's unenforceability counterclaim.  *Compare id.* at 8-11, ¶¶ 103-114 *with id.* at 18-22, ¶¶ 20-32.   Likewise, in pleading unclean hands, T-Max stated that it "incorporates by reference its affirmative defense related to inequitable conduct."  *Id.* at 14, ¶ 123.  Accordingly, these two affirmative defenses are based on the same allegations of inequitable conduct as T-Max's unenforceability counterclaim and should be stricken for the same reasons the counterclaim should be dismissed.  *See International Business Machines*, 2017 WL 1349175, at *4 ("Defendants' counterclaim and affirmative defense for inequitable conduct rise and fall together.").   The defense of unclean hands should also be stricken as redundant.  *See Rosen v. Masterpiece Marketing Group, LLC*, No. 15-cv-06629, 2016 WL 7444698, at *5-6 (C.D. Cal. May 3, 2016) (striking an unclean-hands defense that was, at best, redundant of another defense).

# VI.  CONCLUSION

For the foregoing reasons, the Court should dismiss T-Max's seventh counterclaim for inequitable conduct, without leave to amend, and strike T-Max's second and eighth affirmative defenses.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  February 28, 2018        By: */s/ Sean M. Murray*
John B. Sganga
Sean M. Murray
Loni Morrow

Attorneys for Plaintiff
LUND MOTION PRODUCTS, INC

27540933